UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
═══════════════════════════════

UNITED STATES OF AMERICA,

    v.                                                 **DECISION AND ORDER**
                                                             20-CR-60

STEVEN GONZALEZ,

                        Defendant.
═══════════════════════════════

       On July 11, 2022, Defendant Steven Gonzalez pled guilty to a single-count Superseding Information (Dkt. No. 61) charging him with Narcotics Conspiracy, in violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(C), for which Defendant faces a statutory maximum of 20 years' incarceration and no mandatory minimum. Had he been convicted as charged in Count 2 of the 4-count Indictment (Dkt. No. 1) of Distribution of Heroin, Fentanyl, and Acetyl Fentanyl Causing Death, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C), and 18 U.S.C. § 2, Defendant would have been subject to a 20-year mandatory minimum and a maximum of life.

       Pursuant to the Plea Agreement (Dkt. No. 62), the Government calculated Defendant's total offense level as 25, for a Guidelines range of imprisonment of 70 to 87 months, while Defendant calculated his total offense level as 23, for a range of 57 to 71 months. The parties agree Defendant's Criminal History Category is III, the base offense level is properly calculated as 24, a 2-level increase for maintaining a drug-involved premises applies, and Defendant should receive a 3-level reduction

for acceptance of responsibility.  The initial Presentence Investigation Report (Dkt. No. 69) confirmed the propriety of the agreed-upon calculations.  However, the Government contends, and Defendant disputes, that a 2-level enhancement for obstruction of justice applies under Guidelines § 3C1.1, resulting in the 2-level difference between calculated total offense levels.

In addition to its position that the Guidelines range of imprisonment is 70 to 87 months, the Government reserved the right to argue for an upward departure pursuant to Guidelines § 5K2.1 (death policy statement) and § 5K2.2 (physical injury policy statement), based on the June 12, 2019 overdose death of L.K., which the Government maintains was caused by Defendant's distribution of heroin/fentanyl.  In later filings, the Government argued in the alternative for a similarly sized upward variance pursuant to 18 U.S.C. § 3553(a) based upon the overdose death.  Defendant reserved the right to oppose any request by the Government for an upward departure and to ask for a sentence outside the applicable Guidelines range.

The Court conducted a *Fatico* hearing on August 16, 2023 and September 6, 2023 on the disputed obstruction-of-justice enhancement and the Government's requested upward departure/variance.  The Government called four witnesses to show that (1) Defendant had obstructed justice by encouraging Roman Lapp to continue providing false information to the Government concerning the origin of the narcotics Lapp provided to L.K., and (2) Defendant's distribution of heroin and fentanyl was the "but for" cause of L.K.'s overdose death.

After the parties filed post-hearing briefing (Dkt. Nos. 101, 102), the Court ordered additional briefing because the Government had not specified the extent of

the upward departure it is seeking. In the Government's supplemental memorandum (Dkt. No. 104), it clarified that it is asking for a sentence in the range of 216 to 228 months' (18 to 19 years') imprisonment, *i.e.*, one or two years below the 20-year statutory maximum. Such a sentence would fall within one of two ranges in the Sentencing Table—either 188 to 235 months, which with a Criminal History Category III is a total offense level 34, or 210 to 240 months,[1] which with a Criminal History Category III is a total offense level 35. In other words, assuming the application of the 2-level enhancement for obstruction of justice and thus a total offense level of 25 as calculated by the Government, the Government requests an upward departure or an upward variance the equivalent of 9 or 10 levels for the overdose death of L.K.[2]

The Court has carefully considered the testimony and exhibits offered during the sentencing hearing, the parties' post-hearing briefs, oral argument that was heard on November 6, 2023, and the Government's supplemental memorandum. Upon due consideration of the foregoing, and for the following reasons, the Government's request for a 2-level increase for obstruction of justice pursuant to Guidelines § 3C1.1 is GRANTED, and its request for a 9-level or 10-level upward

---

[1] With a statutory maximum of 20 years, the range of 210 to 262 months becomes 210 to 240 months.

[2] The Government's brief confusingly states it is seeking a 12-level upward departure/variance to a total offense level 37, and a range of 262 to 327 months' incarceration. It acknowledges the entirety of that range is above the statutory maximum of 240 months and proceeds to reason that it is therefore requesting a sentence in the range of 216 to 228 months. As such, the Court has interpreted this request as actually one for a 9- or 10-level upward departure/variance, consistent with the Government's position of what an appropriate sentence would be.

departure pursuant to Guidelines § 5K2.1 is GRANTED.  Because the Court is granting an upward departure under § 5K2.1, the Court finds it unnecessary to analyze a potential departure under § 5K2.2 or a potential variance under 18 U.S.C. § 3553(a).

## **STANDARD**

In determining whether an upward departure from the authorized guidelines range is warranted under Guidelines § 5K2.1, a three-step analysis applies.

First, a district court must find, by a preponderance of the evidence, that the defendant's conduct resulted in death—and the sentencing court may rely on circumstantial evidence to make this determination.  *See United States v. Holmes*, 19-CR-249S (2), 2022 WL 4244220, 2022 U.S. Dist. LEXIS 166886, *16-17 (W.D.N.Y. Sept. 15, 2022), citing *United States v. McCray*, 17-CR-147, 2020 WL 103476, at *2, 2020 U.S. Dist. LEXIS 3799, *5 (W.D.N.Y. Jan. 9, 2020) and *United States v. Cordoboa-Murgas*, 233 F.3d 704, 710 (2d Cir. 2000).

Second, once such a finding has been made, a district court is next tasked with determining whether to apply an upward departure.  *See Holmes*, 2022 U.S. Dist. LEXIS 166886 at *17, citing *Cordoboa-Murgas*, 233 F.3d at 710.  A sentencing court need not necessarily apply the departure; in determining whether to or not, Guidelines § 5K2.1 (death policy statement) provides guidance, in pertinent part:

> Loss of life does not automatically suggest a sentence at or near the statutory maximum.  The sentencing judge must give consideration to matters that would normally distinguish among levels of homicide, such as the defendant's state of mind and the degree of planning or preparation.  Other appropriate factors are whether multiple deaths resulted, and the means by which life was taken.

4

Third, if a district court has concluded an upward departure is warranted, it must determine the extent of such a departure. *See Holmes*, 2022 U.S. Dist. LEXIS 166886 at *17. With respect to this step, Guidelines § 5K2.1 states, in relevant part:

> The extent of the increase should depend on the dangerousness of the defendant's conduct, the extent to which death or serious bodily injury was intended or knowingly risked, and the extent to which the [applicable] offense level . . . already reflects the risk of personal injury.

The Second Circuit has reiterated that while the standard for factual findings at sentencing is a preponderance of the evidence, including when it is considering a departure under § 5K2.1, "[a] district court should, however, take into consideration the degree of proof satisfied beyond a preponderance when exercising its discretion to decide whether and how much to depart." *United States v. McCray*, No. 20-2545, 2021 U.S. App. LEXIS 22478, *18 (2d Cir. July 29, 2021), citing *Cordoba-Murgas*, 233 F.3d at 709-10. In other words, "even when it is more likely than not that death resulted from the defendant's conduct, courts retain broad 'discretion' to decide 'whether to depart and if so, by how much.'" *McCray*, 2020 U.S. Dist. LEXIS 3799, at *5, quoting *Cordoba-Murgas*, 233 F.3d at 709-10.

With respect to the obstruction enhancement, Guidelines § 3C1.1 states in full:

> If (1) the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct; or (B) a closely related offense, increase the offense level by 2 levels.

5

Finally, the Court notes that in resolving disputed sentencing factors, "judges are not restricted to information that would be admissible at trial . . . [Rather, a]ny information may be considered, so long as it has sufficient indicia of reliability to support its probable accuracy . . . Reliable hearsay evidence may be considered . . . [while u]nreliable allegations shall not be considered." § 6A1.3, comment.

## FACTS

On June 12, 2019, victim L.K. contacted Roman Lapp, her friend of nearly 20 years, and asked him to obtain heroin for her use.  Hearing Transcript 8/16/2023 (HT1) at 12.[3]  Lapp was already at work at Niagara Metal Scrap Yard when L.K. made her request that morning but he assured her that he would acquire the narcotics later, and bring them to her after his shift ended at 4:00 p.m.  HT1 at 46.

At 2:52 p.m., Lapp used his cell phone to call 585-219-7721, a number associated with Defendant.  Hearing Exhibit 25 (FBI Cellular Analysis Survey Team Report dated May 4, 2022).  Lapp called that number again at 3:10 p.m., and at 3:12 p.m., the cell phone associated with number 585-219-7721 called Lapp.  *Id*.

At 4:08 p.m., Lapp's gray car parked on West Avenue in Buffalo, New York, right by Defendant's residence at 1252 West Avenue.  Hearing Transcript 9/6/2023 (HT2) at 24-25.  One minute later, Lapp exited his vehicle and walked to the right side of Defendant's house to its side entrance.  HT2 at 26.  Lapp's car left the area sometime between 4:36 p.m. and 4:44 p.m.  HT2 at 27-28.

---

[3] The transcripts from the two hearing dates are at Docket Numbers 96 and 97, respectively. The Court has used the pagination generated by CM/ECF in the header of these transcripts.

Between 4:37 p.m. and 4:45 p.m., Lapp called L.K. four times. Hearing Exhibit 25. Based on the locations of cell towers fielding those calls, Lapp was moving south during that timeframe. *Id*.

Lapp bought approximately 1 gram of what he believed to be, due to its dark grayish color, a mixture of heroin and fentanyl from Defendant that afternoon, and then drove to South Buffalo. HT1 at 18, 31, 34-35. At approximately 5:00 p.m., Lapp picked up L.K. and her son at the intersection of Ladner and South Park, as they had been walking home from the library. HT1 at 32-33. From there, all three traveled in Lapp's car for approximately one minute to L.K.'s residence at 127 Mariemont in Buffalo, New York. HT1 at 32; Hearing Exhibit 16 at 16.

Once inside L.K.'s house, her son remained upstairs but she and Lapp went to the basement to ingest the narcotics that Lapp had obtained for her from Defendant. HT1 at 32-33. Lapp opened the bag of powder and poured a portion of the contents out in two small piles, one "bump" for each of them, on a little yellow tray that he saw on top of L.K.'s dryer. HT1 at 33-35. Shortly after snorting the drugs, Lapp received a phone call that his eyeglasses prescription was ready for pick-up across town and the shop would be closing at 6:00 p.m. HT1 at 33. Lapp went upstairs, leaving the remaining narcotics[4] in the basement with L.K. HT1 34-35. Once upstairs, Lapp spoke with L.K.'s son for about five minutes before leaving the residence at approximately 5:20 p.m. HT1 at 34.

---

[4] Lapp testified that one gram contained approximately ten "bumps." HT1 at 20.

After picking up his glasses from Stanton Optical near Sheridan and Eggert, Lapp called L.K. at approximately 6:15 p.m.  HT1 at 45.  She did not answer, and she did not answer any of his other calls that evening.  *Id*.  In fact, after 5:10 p.m., no outgoing calls were made or text messages sent from L.K.'s phone, despite numerous incoming communications.  HT1 at 100; Hearing Exhibit 25.

Around 8:30 p.m., a family member discovered L.K. in her basement, unresponsive and cold to the touch.  Hearing Exhibit 12 (Erie County Medical Examiner's Office Investigation Report); Hearing Exhibit 17 (Grand Jury Transcript of D.T.) at 4.  Despite emergency services' efforts to revive L.K., she was pronounced dead at the scene.  Hearing Exhibit 12.

L.K.'s body was taken to the Erie County Medical Examiner's Office for an autopsy due to the apparent overdose nature of her death.  Hearing Exhibit 12.  The following day, Dr. Carolyn Kappen conducted a postmortem and determined the cause of death to be acute intoxication due to the combined effects of amphetamine (specifically, Adderall), lamotrigine (an anti-seizure medication), heroin, fentanyl, norfentanyl, acetyl fentanyl, propranolol (a beta blocker), trazodone (a mood stabilizer), and alcohol.  Hearing Ex. 11 (Erie County Medical Examiner's Office Autopsy Report); *see also* Hearing Ex. 14 (Grand Jury testimony of Erie County Deputy Chief Medical Examiner Katherine Maloney).

Each of the prescription medications in L.K.'s system was within or below the prescribed therapeutic levels.  Hearing Ex. 14 at 7.  Both the fentanyl and acetyl fentanyl, however, were determined to be at lethal levels.  Hearing Ex. 14 at 9-10.

Days after L.K.'s fatal overdose, Lapp was contacted by Buffalo Police Detective Erin McCarthy. HT1 at 48. They met at a Starbucks to discuss the death of L.K. HT1 at 48, 51. Lapp falsely told Detective McCarthy that he obtained the narcotics he gave to L.K. on June 12, 2019 from Freddy Maldanado. HT1 at 49. Lapp was trying to shield Defendant, his drug dealer, from investigation, and he knew Maldanado was dying from leukemia. HT1 at 14, 49-51.

Lapp kept Defendant apprised of his interactions with law enforcement concerning L.K.'s death. HT1 at 51-52. Eventually, the U.S. Attorney's Office subpoenaed him for grand jury testimony. HT1 at 53. Prior to testifying before the Grand Jury, Lapp changed Defendant's contact information in his phone, and then allowed Detective McCarthy to search the device. HT1 at 54. Specifically, Defendant had previously been listed in Lapp's contacts as "Unc," but Lapp switched out Defendant's phone number with Maldanado's number under the contact "Unc" to further distance Defendant from the investigation. HT1 at 54-55.

Based on Lapp's meeting with Detective McCarthy earlier on the day when he was supposed to provide grand jury testimony, Lapp agreed to make a controlled call to Defendant, which law enforcement observed and audio recorded. HT1 at 56-57. During that phone conversation, Lapp advised Defendant that "the Feds" did not believe Freddy Maldanado had provided Lapp with the drugs L.K. used on the evening of her death. HT1 at 59-61. Defendant responded that Lapp should "stick to the story." HT1 at 61. Defendant knew the Maldanado story was designed to protect him from criminal investigation. HT1 at 51, 56.

**DISCUSSION**

Initially, the Court finds by a preponderance of the evidence that Defendant willfully obstructed justice by instructing Lapp to "stick to the story" – a story both men knew to be patently false. While the evidence does not lead the Court to believe Defendant concocted this false narrative about Maldanado providing Lapp with the drugs used by L.K. on the fatal night, that is not a criterion of § 3C1.1.

Defendant was aware that law enforcement and the U.S. Attorney's Office were investigating and pursuing the overdose death of L.K. Defendant stood to benefit from the false narrative that the narcotics that caused the overdose death came from Maldanado. He told Lapp to continue providing the false Maldanado story to the Government even when Lapp advised him that the Government did not find it credible. Accordingly, it is more likely than not that Defendant encouraged Lapp to continue lying to the Government to protect himself from the criminal consequences of his actions, making his obstruction willful and thereby satisfying the Guidelines criteria.

Moving on to the death enhancement, there is no dispute that L.K. overdosed on June 12, 2019 and that the cause of her death was acute mixed drug intoxication involving lethal levels of fentanyl and acetyl fentanyl. *See* Dkt. No. 90 (Joint Hearing Stipulation) at ¶¶ 5-6. Rather, Defendant disputes that the drugs he provided to Lapp, which were in turn provided to L.K., were the drugs that caused her death. Defendant suggests that another source could have provided additional drugs to L.K. that day, and that those drugs, not the heroin and fentanyl mixture sold by Defendant, caused her fatal overdose.

10

As a threshold matter, the Court concludes by a preponderance of the evidence that Defendant's conduct resulted in L.K.'s fatal overdose.  As the Government aptly noted during oral argument, despite being provided with L.K.'s phone records, Defendant failed to identify another person who provided, or even could have provided, L.K. with fentanyl that day.  While it is theoretically possible L.K. had been provided with heroin and fentanyl from another source on June 12, 2019, because no such evidence was offered it would be pure speculation to conclude another individual's drug distribution caused L.K.'s overdose and death.

With respect to Defendant's theory that L.K. must have used other drugs before Lapp picked her up because Lapp did not notice her exhibiting symptoms of withdrawal, the Court finds the theory—at its face—somewhat persuasive.  Lapp knew L.K. for nearly two decades.  He testified that for her to go seven hours without heroin at that point in her addiction would have resulted in withdrawal symptoms. HT1 at 71.

To further support this theory, however, Defendant contends that a different substance was present on the yellow tray in Hearing Exhibit 35C than the substance pictured in a plastic baggie in Hearing Exhibit 35D.  The Court is not persuaded that the drugs pictured in those exhibits are different colors.  Hearing Exhibit 35D is a close-up photograph, zoomed in from the perspective of Hearing Exhibit 35C.  One cannot accurately compare the shades of gray between the powdered substances, especially when the poor lighting of the basement is considered.

Therefore, while it is possible that L.K. used another substance containing fentanyl earlier on the day in question, no credible evidence was presented that

such a substance was present at the scene of her death.  The Court therefore concludes another substance could not have been the but for cause of L.K.'s fatal overdose.  Moreover, the Court notes that if L.K. was in fact experiencing withdrawal symptoms Lapp did not notice, it would provide a motive for her to use more of the drugs after Lapp left the basement, as he testified that both he and L.K. used heroin to keep withdrawal symptoms at bay.  HT1 at 36.

The Court next finds that an upward departure is warranted.  L.K.'s life was taken by Defendant's antisocial dealings in narcotics.  Erie County Deputy Chief Medical Examiner Katherine Maloney testified before the Grand Jury that L.K. was a healthy 34-year-old who would not have died but for the fentanyl and acetyl fentanyl found in her system.  Hearing Exhibit 14 at 10-12.  While no evidence was presented to the Court indicating Defendant intentionally caused L.K.'s death, his extremely dangerous conduct in mixing heroin, fentanyl, and acetyl fentanyl together in undisclosed ratios cannot be minimized.  Defendant sold his amalgamated product to Lapp and others without warning as to what proportion was fentanyl, a drug many times more powerful than heroin.[5]

Finally, the Court concludes that a 9-level upward departure is warranted by the facts.  Defendant's conduct was extremely dangerous; however, the Court

---

[5] Lapp, as a former drug addict, testified that fentanyl is "100 times stronger" than heroin.  HT1 at 18.  In addition, according to the Centers for Disease Control and Prevention, fentanyl is "up to 50 times stronger than heroin[.]"  *Stop Overdose: Fentanyl Facts*, Centers for Disease Control and Prevention, https://www.cdc.gov/stopoverdose/fentanyl/index.html#:~:text=Fentanyl%20is%20a%20syntheti c%20opioid,100%20times%20stronger%20than%20morphine (last visited Nov. 29, 2023).

recognizes no evidence was presented that he intentionally caused L.K.'s death. On the other hand, Defendant was well aware his business model created a risk of great harm, including fatal overdoses, to his customers. Furthermore, it is undisputed that he continued distributing heroin, fentanyl, and acetyl fentanyl for months after L.K.'s fatal overdose. *See* Dkt. No. 62, ¶ 4(a). Defendant's intentional or reckless disregard for the health and safety of his customers warrants a significant departure. The Court also bears in mind, however, pursuant to Guidelines § 5K2.1, that the evidence shows one death resulted from Defendant's conduct as opposed to multiple deaths.

On balance, after taking into consideration the degree of proof satisfied beyond a preponderance of the evidence, the Court finds that a 9-level upward departure is warranted. The 2-level obstruction enhancement increases Defendant's total offense level to 25, and the 9-level upward departure raises it to 34. With a Criminal History Category III, Defendant's Guidelines imprisonment range is 188 to 235 months.

## **CONCLUSION**

For the reasons stated herein, the Government's request for a 2-level increase for obstruction of justice pursuant to Guidelines § 3C1.1 is GRANTED, and its request for a 9- or 10-level upward departure pursuant to Guidelines § 5K2.1 is GRANTED. The Court finds that L.K.'s death resulted from Defendant's drug trafficking activities, and that the circumstances of this case warrant a 9-level upward departure.

The Court recognizes that Defendant nevertheless reserved the right to recommend a sentence outside the applicable Guidelines range, an argument that may be made in a written request for a non-Guidelines sentence and subsequently at sentencing.  Defendant's sentencing will proceed as previously scheduled on December 18, 2023 at 3:00 p.m.  The parties are directed to the Court's amended schedule for the submission of sentencing papers, which will be issued after the filing of the instant Decision and Order.

**IT IS SO ORDERED.**

                                             _s/*Richard J. Arcara*_
                                             HONORABLE RICHARD J. ARCARA
                                             UNITED STATES DISTRICT COURT

Dated:  December 5, 2023
        Buffalo, New York